# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

FRANK HUNSAKER,              )
                             )
          Plaintiff,         )   CIVIL ACTION
                             )
v.                           )   No. 09-2666-KHV
                             )
THE PROCTER & GAMBLE         )
MANUFACTURING COMPANY,       )
                             )
          Defendant.         )
_____)

## MEMORANDUM AND ORDER

Plaintiff brings suit against his former employer, The Procter & Gamble Manufacturing Co. ("P&G"), alleging discriminatory termination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA") (Count I), and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA") (Count II).[1] He asserts that defendant terminated his employment because of his age – 56 – and because of his actual or perceived disability – clinical depression. Defendant asserts that it terminated plaintiff's employment because he committed a safety violation that could have injured himself or another after repeatedly violating safety and quality standards over the course of roughly one year. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #54) filed October 20, 2010. For the following reasons the Court sustains defendant's motion.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,

---

[1] On April 8, 2010, the Court sustained defendant's motion to dismiss all claims other than plaintiff's discriminatory termination claims, thus eliminating any other theory of recovery that plaintiff may assert. See Order (Doc. #13).

and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A "genuine" factual dispute is one "on which the jury could reasonably find for the plaintiff," and requires more than a mere scintilla of evidence. Liberty Lobby, 477 U.S. at 252. A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Id. at 248.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1085 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to show that a genuine issue remains for trial with respect to the dispositive matters for which it carries the burden of proof. Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 739 (10th Cir. 2004); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). As to these matters, the nonmoving party may not rest on its pleadings but must set forth specific facts. Fed. R. Civ. P. 56(e)(2); Matsushita, 475 U.S. at 586-87; Justice, 527 F.3d at 1085. Conclusory allegations not supported by evidence are insufficient to establish a genuine issue of material fact. Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007); see Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996).

When applying this standard, the Court must view the factual record in the light most favorable to the party opposing the motion for summary judgment. Duvall v. Ga.-Pac. Consumer Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010); see Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009). Summary judgment may be granted if the nonmoving party's evidence is merely colorable

or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## Facts

The following facts are either uncontroverted, deemed admitted or construed in the light most favorable to plaintiff.

### Defendant's Operation and Plaintiff's Position

In 1998, defendant hired plaintiff, at age 47, to drive a fork lift at its Kansas City plant where it produces liquid dish soap. Plaintiff's Depo. 142:14-143:8. When defendant terminated plaintiff's employment effective January 2, 2009, he was 57 years old, two-and-a-half years from retirement, held a Tech 3 Mechanical/Electrical and Instrument ("Mech/E&I") position and worked as a Line Operator in the In-Case Fill Department. Id. 21:24-25:1, 50:10-13, 113:22-114:1; Plaintiff's Response To Defendant's "Undisputed Facts," Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment (Doc. #67) ("Pl.'s RDUF") ¶ 6; P&G's Statements Of Fact Have Been Admitted, Defendant's Reply In Support Of Its Motion For Summary Judgment (Doc. #73) ("Def.'s SOF Reply") ¶ 6. Defendant gave the Mech/E&I title to employees who pursued either a mechanical or an electrical career path, but defendant did not allow its employees to pursue both. Mia Wise Decl. ¶ 16; Statement Of Facts, Defendant's Memorandum In Support Of Motion For Summary Judgment (Doc. #55) ("Def.'s SOF") ¶ 12; Pl.'s RDUF ¶ 12. Plaintiff pursued a mechanical career path and does not claim to be an E&I. See Plaintiff's Depo. 55:16-23; Def.'s SOF ¶ 12; Pl.'s RDUF ¶ 12. Notwithstanding his title and training as a mechanic, plaintiff functioned as a Line Operator who sometimes performed mechanical functions on his lines. Def.'s SOF ¶ 14;

-3-

Pl.'s RDUF ¶ 14; Plaintiff's Depo. 18:17-18, 44:13-14, 175:7-11.[2]

The In-Case Fill Department where plaintiff worked consists of several conveyor lines on which cardboard boxes of empty bottles move through a mechanized process to be filled with dishwashing liquid and sealed with a cap. Phillips Decl. ¶ 2; Def.'s SOF ¶ 3; Pl.'s RDUF ¶ 3. The process is monitored by computers that measure a variety of data including weight and torque, which signal the line operator to make appropriate adjustments in the line. Phillips Decl. ¶ 2-3; Def.'s SOF ¶ 3; Pl.'s RDUF ¶ 3. In addition, a line operator is required to inspect the product to ensure that it is properly labeled. See Phillips Decl. ¶ 2; Def.'s SOF ¶ 3; Pl.'s RDUF ¶ 3. If the line operator does not immediately correct the weight and torque of the line, or if the product labeling is incorrect, the product must be pulled from the line and either reworked or scrapped at a significant cost to defendant. Phillips Decl. ¶ 4; Def.'s SOF ¶¶ 3-5; Pl.'s RDUF ¶¶ 3-5.

### Defendant's Disciplinary System

Defendant's Kansas City soap plant had a "Positive Discipline System" and a "Progressive Discipline System," which worked together to ensure that employees complied with its quality and safety standards. Def.'s SOF ¶ 6; Pl.'s RDUF ¶ 6. These standards are essential to the operation of the plant. Def.'s SOF ¶ 6; Pl.'s RDUF ¶ 6. Defendant's disciplinary systems provide three disciplinary steps prior to termination. Step 4 is termination and is imposed "[i]f an employee fails to improve his/her performance to acceptable standards or in cases of serious violations of rules."

---

[2] In 2005 or 2006 when defendant's plant converted from a 7-day work week to a 5-day work week, plaintiff stepped down from a Mechanic 2 position to a Mechanic 3 position. See Plaintiff's Depo. 17:20-18:18. Around this time plaintiff began to perform line operator functions. See Plaintiff's Depo. 17:20-18:18. Plaintiff asserts that he was unfairly required to work as a Line Operator, despite his title and training, but he does not dispute that he in fact functioned as a Line Operator. See Def.'s SOF ¶ 14; Pl.'s RSOF ¶ 14; Plaintiff's Depo. 18:17-18, 44:13-14, 175:7-11.

Def.'s SOF ¶ 6; Pl.'s RDUF ¶ 6; Wise Decl. ¶ 4. Defendant generally follows the principle that actions taken to manage employee behavioral issues should be "appropriate to the nature and seriousness of the behavior." Wise Decl. ¶ 5, Tab 1; Def.'s SOF ¶ 7; Pl.'s RDUF ¶ 7. This means that if a single offense is sufficiently severe, it alone may justify terminating an employee regardless of length of service or prior work record. Wise Decl. ¶ 5, Tab 1; Def.'s SOF ¶ 7; Pl.'s RDUF ¶ 7. Defendant also has an Employee Assistance Program ("EAP"), to help employees manage personal problems that could adversely affect their work. Wise Decl. ¶ 3.

### Plaintiff's Disciplinary Record

On January 4, 2008, defendant placed plaintiff on Step 3 of defendant's disciplinary system because of a "trend of poor performance in the area of quality," which included quality incidents on September 12, 2000, and July 24 and October 17, 2007; noncompliance with proper procedures on April 6, 2004; and a safe practices infraction on January 31, 2005. Def.'s SOF ¶¶ 15-16; Pl.'s RDUF ¶¶ 15-16; Def.'s Ex. A-5.[3] In conjunction with this disciplinary action, plaintiff submitted a

---

[3] Defendant's "Summary of Past Performance Leading to Step 3 of Discipline" stated in full as follows:

09/12/00   QI [(quality incident)] on Line #8 resulting in 6 hours of production with missing cap code dates. Proper procedures were clarified with you at this time.

04/06/04   Working inside the Line 10 (enzyme line) without a respirator. Proper procedures were clarified with you at this time.

01/31/05   Broke safe practice by carrying a cap plate by himself during size changeover on line 7. Proper safe practices were reviewed with you at this time.

02/25/07   AM Team did not meet deployed expectations.

(continued...)

"Personal Action Plan" which stated that he understood "the losses that have occurred due to my poor performance in these areas." Personal Action Plan To Improve Performance, Def.'s Ex. A-5.

Plaintiff admits that defendant placed him on Step 3, but asserts that the discipline was unwarranted. Pl.'s RDUF ¶¶ 15-16. Specifically, he states that his supervisor at the time, Jon Wright, placed him on the most difficult lines and harassed and intimidated him after he returned from disability leave for a shoulder injury in 2006. Pl.'s RDUF ¶¶ 15-16. Plaintiff testified that he had no knowledge of Wright overtly discriminating against him based on age or disability, see Plaintiff's Depo. 294:16-19, 333:4-25, but asserts that Wright treated him differently than younger, non-disabled employees and that defendant placed him on Step 3 because of his age and his disability or perceived disability, Pl.'s RDUF ¶¶ 15-16. Wright transferred from defendant's soap plant to one of its Folger's plants in the spring of 2008, but was involved in compiling plaintiff's performance feedback summary in July of 2008. In November of 2008, defendant sold the Folger's plant to Smucker's, which terminated Wright's Procter & Gamble employment. Pl.'s Ex. N

On February 1, 2008, plaintiff had another quality incident; he inaccurately completed two

---

[3](...continued)

07/24/07   QI on Line #3 after a B/C to non-regulated product, expiration dates were continued to be placed on caps. Proper procedures were not followed in completing the line sheet and checks that were not done were documented as complete (falsification of documentation). Proper procedures were clarified with you at this time.

10/17/07   QI on Line #10 resulting in 93 unit loads of 90oz Dawn Advanced Power produced without a case code date. Despite several previous reviews of expectations in this area, proper procedures were not followed in completing the line sheet and checks that were not done were documented as complete (falsification of documentation).

Def.'s Ex. A-5.

required quality checks and "falsified documentation" by misstating that cap code dates on products on his line were correct. Def.'s SOF ¶ 20; Def.'s Ex. 7; Def.'s Ex. 24. On or about February 4, 2008, plaintiff began an unplanned medical leave of absence. See Def.'s SOF ¶ 21; Pl.'s RDUF ¶ 21. On May 7, 2008, after plaintiff returned to work, defendant held a fact-finding interview with plaintiff regarding his quality incident on February 1, 2008. See Def.'s SOF ¶ 25; Pl.'s RDUF ¶ 25. During the interview, plaintiff stated that he "had thoughts of suicide" and "had a meltdown" which caused the quality incident. Def.'s SOF ¶ 25; Pl.'s RDUF ¶ 25. He also stated that he was seeing a psychiatrist and being treated with anti-depressants. Def.'s SOF ¶ 25; Pl.'s RDUF ¶ 25.[4]

On May 28, 2008, defendant required plaintiff to repeat his Step 3 disciplinary process, participate in mandatory EAP and complete retraining. See Def.'s SOF ¶ 27; Pl.'s RDUF ¶ 27. Plaintiff admits being disciplined, but asserts that he did not commit "any wrongful acts not related to his disability," and that any mistakes he made were due to working significant overtime, unfair harassment by Wright and plaintiff's disability. Pl.'s RDUF ¶ 20. When plaintiff returned to work, defendant temporarily restricted him from overtime work, per his doctor's orders. See Def.'s SOF ¶¶ 16, 23; Pl.'s RDUF ¶¶ 16, 23.

In June and July of 2008, plaintiff had four quality incidents involving weight and torque issues on his lines. See Def.'s SOF ¶ 31; Pl.'s RDUF ¶ 31. On July 17, 2008, plaintiff's supervisor, Johnie Phillips, conducted a fact-finding interview. See Pl.'s Ex. S at 10; Def.'s SOF ¶ 31; Pl.'s

---

[4] Plaintiff served two tours of active duty in the Vietnam War. Disputed Facts, Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment (Doc. #67). Plaintiff testified that upon returning from Vietnam he had trouble sleeping and periodically received medication for his sleeplessness. He offers no evidence, however, that defendant knew of his sleeplessness or that it is related to his clinical depression.

RDUF ¶ 31. The notes from the interview indicate that plaintiff stated: "Sorry just came back from nervous break down. I used to be the go to guy. The break down was due to 9 & 10 issue." Pl.'s Ex. S at 10; Def.'s SOF ¶ 31; Pl.'s RDUF ¶ 31. During the same interview, plaintiff told Phillips that "we need support on the floor;" "we have had people quit;" and "9 & 10 are the worst." Pl.'s Ex. S at 10. On August 8, 2008, defendant issued plaintiff a memo which stated that his

> ability and or willingness to adhere to and or comply with qualify standards . . . over the past 7+ years shows an unchanging trend of poor performance. Disciplinary actions and personal improvement plans have not changed [his] level of performance nor increased [his] apparent awareness of quality standard[s] . . . during this period of time.

Def.'s Ex. A-8. The memo included a "Return to Work Improvement Plan" which required additional training and supervision. Def.'s Ex. A-8. It also contained "Performance and Work Expectations for Frank Hunsacker [sic]" and stated that "[f]ailure to meet these expectations or any other unsatisfactory performance could lead to further discipline, up to and including termination." Def.'s Ex. A-8; see Def.'s SOF ¶¶ 30-31; Pl.'s RDUF ¶¶ 30-31. On August 17, 2008, defendant issued plaintiff another memo which identified the retraining which it would provide plaintiff, as well as the timing of plaintiff's Quality Assurance Knowledge Checks. Def.'s Ex. A-8. After returning to work in May of 2008, plaintiff never told Phillips or Steven Shepard, the Plant Converting Operations Manager, that he was having trouble performing his job responsibilities, Plaintiff's Depo. 400:1-13,[5] and the record contains no evidence that defendant offered to move plaintiff off of lines 9 and 10, see Phillips Depo. 99:7-13.

Each of the disciplinary memos, which plaintiff signed, contained the following statement:

---

[5] Shepard testified that although he did not know about plaintiff's clinical depression at the time, it could have contributed to his disciplinary incidents from July of 2007 through February of 2008. See Shepard Depo. 53:6-22.

"Failure to meet these expectations or any other unsatisfactory performance could lead to further discipline, up to and including termination." Def's Exs. A-5, A-6, A-7, A-8.

Plaintiff does not dispute his disciplinary record, but asserts that the disciplinary incidents that occurred during 2008 were due to his disability and because defendant made him work lines 9 and 10. See Pl.'s RDUF ¶¶ 16, 20. He also asserts that defendant did not implement its disciplinary system fairly or consistently, and that defendant did not require all employees to comply with it. Id. ¶ 6. Specifically, plaintiff names three employees who defendant allegedly treated better than him because they were younger and not disabled. Id. Defendant terminated the first two employees, Bobby Salmon and Josh Hudson, for shooting an air pistol at work, id.; Wise Depo. 35:2-38:3, but later offered to reinstate them as part of a settlement to avoid arbitration, Wise Depo. 37:14-38:5. Only Salmon returned to work. See id. 35:16-19. Salmon was in his late twenties and Hudson was roughly 30 years old. Id. 35:14-21; see Personnel Record For Josh Hudson, Pl.'s Ex. J. The third employee, Melody Brosnan, was in her mid-thirties when she violated defendant's safety requirements for working on a palletizer, which could have seriously injured or killed Brosnan or others. Pl.'s Ex. I at 15; Phillips Depo. 122:3-123:24. Defendant sent her home and required her to develop an improvement plan, but did not formally discipline her. Pl.'s Ex. I at 15.

**Solenoid Incident**

Beginning on August 24, 2008, plaintiff had no further medical leave or medical restrictions. Def.'s Ex. A-16; DEF.'s SOF ¶ 39; Pl.'s RDUF ¶ 39. On or about November 30, 2008, plaintiff responded to a smoking solenoid on his conveyor line by cutting the live wires leading to it. Def.'s SOF ¶ 41; Pl.'s RDUF ¶ 41; Plaintiff's Depo. 137:14-17. Plaintiff testified that he felt the conveyor vibrating and then heard the electrical solenoid buzzing. Plaintiff's Depo. 126:11-127:10. Based

on the buzzing sound, plaintiff determined that "the solenoid was going bad." Id. 127:7-10. He then called two electricians who inspected the solenoid then left the area. Id. 129:18-21, 133:12-134:7. As plaintiff began removing the piping and air valve that adjoined the solenoid, it began to smoke and emit a molten substance from the bottom. Id. 210:9-16.

Plaintiff believed that the solenoid was on fire and could have caused extensive damage to defendant's facility. Id. 177:11-21; Def.'s Ex. A-3. Defendant's "Electrical Safety Awareness Training" states that only qualified electricians may deal with electrical hazards, and that if an employee who is not an electrician discovers an electrical hazard, he should contact an on-duty electrician. See Pl.'s Ex. I at 13-14; Plaintiff's Depo. 137:7-21. It also provides that if a person is shocked, an employee should de-energize the source of power through any "up-stream device" such as a "local disconnect, MCC bucket, switch, etc." Pl.'s Ex. I at 13.

Plaintiff knew that cutting the live wires was dangerous, Plaintiff's Depo. 171:9-12, and that only electricians were permitted to cut live wires, id. 176:25-177:5. He nevertheless did not call an electrician after the solenoid started smoking and before he cut the wires. Id. 136:8-13. Plaintiff knew that he was violating a safety rule in doing so, id. 198:18-25, 199:5-200:23, 202:4-14, and that he was never trained to use his discretion to determine the appropriate response to an emergency, id. 195:17-21. Plaintiff thought that the smoking solenoid was an extenuating circumstance, however, and that he believed his actions were appropriate. Id. 176:3-8. After the incident, but before defendant terminated plaintiff's employment, plaintiff wrote a letter to Plant Manager Jack Geissinger that summarized his perspective on the solenoid incident in part as follows:

> I did not break one of our safety rules without a great deal of fore thought [sic]. I certainly was not being malicious. I had always believed our rules were based in principal [sic] and not intended to take the place of our cognitive thought process. I considered the fact that I was not a qualified E and I. I also considered

-10-

> the fact that the on shift E and I had very little if any more qualification than myself. From conversations with him, I know he had less experience.
>
> We here at the site have always been told not to do anything that we were not comfortable with, or don't do anything if you are not sure you can do it safely. In this instance, I used that adage. I did a mental assessment of the situation, the E and I was on the other side of the plant, and the situation demanded an immediate solution.
>
> With my knowlage [sic] of electricity, I knew I could safely remove the problem from the circuit. That would prevent further damage, and shutting down production, and perhaps keeping someone from walking under the solenoid, that was on fire and melting from above.

Def.'s Ex. A-11; see Def.'s SOF ¶ 53; Pl.'s RDUF ¶ 53.

### Termination Process

On November 30, 2008, plaintiff's supervisor, Johnie Phillips, conducted a fact-finding of the solenoid incident. Phillips Depo. 18:6-11; Def.'s SOF ¶ 59; Pl.'s RDUF ¶ 59. Phillips then recommended to the Plant Converting Operations Manager, Steven Shepard, that defendant terminate plaintiff's employment. Phillips Depo. 18:8-25; Def.'s SOF ¶ 59; Pl.'s RDUF ¶ 59. Phillips explained the reasons for his recommendation as follows:

> Because he violated our safety rules and he opened an electrical panel, electrical box, that exposed him to live electrical components. And he worked with, by cutting them, energized electrical components not being electrically qualified. And that's not specifically why he was terminated, also had to do with his past history of not being able to follow standards.

Phillips Depo. 117:5-17; see Def.'s SOF ¶ 60; Pl.'s RDUF ¶ 60. Phillips further noted that "it had become evident that Frank could not follow standards, . . . that he puts himself above the standards based on his judgment" and that "there was no way to ensure his safety or the safety of others that work around him." Phillips Depo. 19:24-20:6, 21:4-20; see Def.'s SOF ¶¶ 60-61; Pl.'s RDUF ¶¶ 60-61. Phillips testified that at the time he recommended terminating plaintiff's employment, he

knew that it would impose a significant financial hardship on plaintiff. Phillips Depo. 119:22-120:2.

Steven Shepard reviewed Phillips's fact-finding and agreed with his recommendation to terminate plaintiff's employment. Def.'s SOF ¶ 66; Pl.'s RSOF ¶ 66. Mia Wise, the soap plant's Human Resource Manager, reviewed plaintiff's file, compared his case to prior cases and recommended to Jack Geissinger, the Plant Manager, that defendant terminate plaintiff's employment. Wise Depo. 10:5-8, 30:8-15; Def.'s SOF ¶ 63; Pl.'s RDUF ¶ 63. After receiving Shepard and Wise's recommendations, Geissinger decided to terminate plaintiff's employment. See Def.'s SOF ¶ 69; Pl.'s RDUF ¶ 69. In a memo to plaintiff, Geissinger stated the grounds for his termination as follows:

> At the time of the incident resulting in your termination, you were in Step 3 of our disciplinary system. You received the Step 3 on 8/8/08 for multiple QI incidents between 6/08 - 7/08, which were the result of you not following quality standards. The Step 3 administered in August was your third Step 3 disciplinary action within the last year.
>
> The incident resulting in your termination occurred on 11/30/08. On 11/30/08, you knowingly violated the "Site Electrical Safety Standards" by performing work on electrical wiring for which you were not qualified. Your choice to violate the policy could have been <u>fatal or led to serious personal injury</u>. In addition to violating the policy, you also acted counter to one of our most basic safety principles: "Nothing we do is worth getting hurt". Therefore, the decision was made to terminate your employment with Procter & Gamble.

Def.'s Ex. A-12 (emphasis in original).

To plaintiff's knowledge, Phillips and Wise never discriminated against him; Shepard never did anything to purposefully hurt him or said anything offensive to plaintiff about his age or disability; and he had no idea whether Geissinger discriminated against him. See Def.'s SOF ¶¶ 62, 64, 67; Pl.'s RSOF ¶¶ 62, 64, 67. Plaintiff argues, however, that all of defendant's actions after he returned from disability leave in May of 2008, including his termination, were motivated by

discrimination based on age and disability (i.e., "clinical depression"). See EEOC Notice Of Charge Of Discrimination, Def.'s Ex. A-3.

**Analysis**

Plaintiff argues that defendant terminated his employment because of age and disability – not because of the solenoid incident or his disciplinary record. Plaintiff may establish that defendant acted with discriminatory intent under the ADA[6] and ADEA[7] either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 824 (1973). See Johnson v. Weld Cnty., Colo., 594 F.3d 1202, 1217 (10th Cir. 2010) (ADA); Jones v. Okla. City Pub. Schs., 617 F.3d 1273 (10th Cir. 2010) (ADEA).[8] Here, plaintiff relies on the indirect method of proving discrimination. See Doc. #55 at 21; Doc. #67 at 23-26 (relying on inference of unlawful discrimination cases). Under the McDonnell Douglas burden-shifting framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008), cert. denied 130 S. Ct. 69 (2009) (quoting Sanchez v. Denver Pub. Sch., 164 F.3d 527, 531 (10th Cir. 1998)). If plaintiff satisfies his burden, the burden

---

[6] The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

[7] The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

[8] In Jones, the Tenth Circuit considered whether the McDonnell Douglas framework applied to ADEA claims after the Supreme Court's decision in Gross v. FBL Financial Servs., Inc., 129 S. Ct. 2343 (2009). It held that "Gross does not preclude our continued application of McDonnell Douglas to ADEA claims." Jones, 617 F.3d at 1278.

shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. McDonnell Douglas, 411 U.S. at 802-03; Sanders, 544 F.3d at 1105 (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)). If defendant does so, the burden shifts back to plaintiff to show a genuine issue of material fact whether defendant's stated reason is pretextual, i.e. unworthy of belief. Sanders, 544 F.3d at 1105. If plaintiff so shows, he gets over the hurdle of summary judgment. Id. (quoting Morgan, 108 F.3d at 1323)).

Defendant asserts that plaintiff has not met several elements of his ADEA and ADA claims.[9] Assuming, however, that plaintiff has established a prima facie case of disability and age discrimination, he has not established a genuine issue of material fact that defendant's nondiscriminatory reason for terminating his employment is pretextual, i.e. not the real reason defendant terminated his employment.[10] Here, defendant asserts that it terminated plaintiff's

---

[9] To establish a prima facie case of disability discrimination under the ADA, plaintiff must show that (1) on December 18, 2008, he either was a disabled person as defined by the ADA or defendant perceived him to be a disabled person as defined by the ADA; (2) on December 18, 2008, he was qualified, with or without reasonable accommodation, to perform the essential functions of a line operator; and (3) defendant terminated him because of his disability. See Pretrial Order (Doc. #52) at 7-8; Zwygart v. Bd. of Cnty. Commn'rs of Jefferson City, Kan., 483 F.3d 1086, 1090 (10th Cir. 2007). Defendant argues that plaintiff has not satisfied any of the three elements of his ADA claim. See Doc. #52 at 7-8; Doc. # 55 at 22, 27-30.

To establish a prima facie case of age discrimination under the ADEA, plaintiff must show that (1) he was 40 years of age or older; (2) defendant terminated his employment; (3) he was qualified for his position at the time he was terminated; and (4) defendant terminated plaintiff's employment because of his age. See Doc. #52 at 7; Jones, 617 F.3d at 1279. Defendant argues that plaintiff has not satisfied the third and fourth elements of his ADEA claim. See Doc. #52 at 7.

[10] Establishing a prima facie case of discrimination under the ADA and ADEA is a "de minimis burden." Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005). Where, as here, a defendant's primary argument against plaintiff's prima facie case is causation (which is essentially the same argument it advances with respect to pretext), it is appropriate to assume that plaintiff has established a prima facie case and consider defendant's arguments in the context of pretext. See
(continued...)

employment because he was on Step 3 of its disciplinary system for multiple quality and safety violations when he violated defendant's safety protocol by cutting live wires leading to a smoking solenoid, which could have injured himself and others. See Def.'s Ex. A-12. To survive summary judgment, plaintiff must establish a genuine issue of material fact that defendant's reason is a pretext for age or disability discrimination. See McDonnell Douglas, 411 U.S. at 802-03; Sanders, 544 F.3d at 1105.

To establish pretext, plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005). In other words, he must produce evidence "that something more nefarious might be at play," not just that defendant "got it wrong." Johnson, 594 F.3d at 1211.

Plaintiff admits the factual basis for his termination, but argues that his actions were justified given the extenuating circumstances of the solenoid incident. See Plaintiff's Depo. 136:8-13, 171:9-12, 176:3-8, 176:25-177:5, 198:18-25, 199:5-200:23, 202:4-14. Plaintiff's only pretext argument is that "Defendant's absolute knowledge of Plaintiff's condition, its refusal to assist him by reassigning him to different line or otherwise accommodating him, and its complete disregard of its allegedly sacrosanct 'safety rules' when the offenders are under 40, all lead inescapably to pretext." Doc. #67 at 26. Plaintiff's first two arguments – knowledge and failure to accommodate – pertain to his ADA claim; his third argument relates to his ADEA claim. The Court will address each in turn.

---

[10](...continued)
Anderson v. AOL, LLC, 363 Fed. Appx. 581, 586 (10th Cir. 2010).

**I.     ADA Claim**

Plaintiff argues that because defendant knew of his clinical depression and did not accommodate him, his disability must have been the true reason defendant terminated his employment. As defendant correctly notes, plaintiff's suit is limited to a claim for discriminatory termination and does not include an accommodation claim. See Doc. #73 at 33; see also Order (Doc. #13) (sustaining defendant's motion to dismiss all claims other than plaintiff's discriminatory termination claims). Liberally construed, however, plaintiff's accommodation argument extends to his discriminatory termination claim. Plaintiff essentially argues that because defendant knew of his clinical depression and yet continued to assign him to the most difficult and stressful lines, plaintiff's performance issues are intertwined with his disability and cannot be separated. In other words, defendant set him up to fail so that it could terminate his employment for performance-based reasons. Plaintiff makes a couple of arguments to this end.

First, plaintiff asserts that Jon Wright, his supervisor from 2006 to 2008, began a "campaign" to "harass, intimidate and place Plaintiff on the most difficult and undesirable tasks" when he returned from disability leave for a shoulder injury. Plaintiff's claim is for discrimination based on his clinical depression, however, not his shoulder injury. See EEOC Notice Of Charge Of Discrimination, Def.'s Ex. A-3. Moreover, Wright left defendant's soap plant in the spring of 2008. Although Wright was involved in preparing plaintiff's performance feedback summary in July of 2008, Pl.'s Ex. N, plaintiff has not produced any evidence that Wright knew of plaintiff's clinical depression before he left, or that he played any role in selecting plaintiff's assignments or deciding to terminate plaintiff's employment after he left the soap plant. Plaintiff's allegations regarding Jon Wright therefore do not raise a genuine issue of material fact that defendant terminated plaintiff

because of clinical depression.

Second, plaintiff asserts that a factfinder may infer pretext from defendant's failure to move him to easier tasks. Plaintiff's supervisor at the time of his termination, Johnie Phillips, first learned of plaintiff's clinical depression in May of 2008 – after defendant first placed plaintiff on Step 3 and after the quality incident of February 1, 2008 for which defendant required plaintiff to repeat Step 3. See Def.'s SOF ¶ 25; Pl..'s SOF ¶¶ 16, 25. Phillips first learned of plaintiff's issues with lines 9 and 10 in July of 2008. See Def.'s SOF ¶ 31; Pl's SOF ¶ 31; Pl.'s Ex. S at 10. All of plaintiff's disciplinary infractions, except for the solenoid incident, therefore occurred before defendant knew of plaintiff's complaints about lines 9 and 10. Although defendant never offered to move plaintiff off of lines 9 and 10, plaintiff never requested to be moved. See Plaintiff's Depo. 400:1-13. Moreover, defendant accommodated plaintiff's overtime restriction, see Def.'s SOF ¶¶ 16, 23; Pl.'s RDUF ¶¶ 16, 23, and provided EAP services and structured retraining when he returned to work from disability leave in early 2008, see Def.'s SOF ¶ 27; Pl.'s RDUF ¶ 27. Plaintiff also testified that to his knowledge Phillips never discriminated against him. See Def.'s SOF ¶ 62; Pl.'s RSOF ¶ 62.

Based on the record construed in the light most favorable to plaintiff, plaintiff has not identified a genuine issue of material fact which might cause a reasonable jury to conclude that defendant's stated reason for terminating plaintiff's employment was a pretext for disability discrimination. The Court therefore sustains defendant's motion for summary judgment as to plaintiff's ADA claim.

**II.     ADEA Claim**

In an attempt to show pretext on his ADEA claim, plaintiff argues that defendant treated him

differently than other similarly situated employees who were not in the protected class and who violated rules of comparable seriousness. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000); Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997).[11] Specifically, plaintiff argues that defendant's stated reason for terminating his employment is pretextual because defendant reinstated Salmon and Hudson after they shot an air pistol at work and because defendant did not terminate Brosnan after she committed a serious safety violation that could have injured or killed her or others.

An employee is similarly situated to plaintiff if the employee deals with the same supervisor and is subject to the "same standards governing performance evaluation and discipline." Aramburu, 112 F.3d at 1404 (internal quotations and citation omitted). In determining whether they are similarly situated, a court should also compare the relevant employment circumstances, such as work history and company policies, which it applied to plaintiff and the purported comparable employees. Id. Plaintiff has shown that Salmon, Hudson and Brosnan all committed serious offenses, that they were all younger than 40 years old and that defendant did not terminate their employment for their offenses. Plaintiff has produced no evidence, however, that Salmon, Hudson or Brosnan were similarly situated. Specifically, he has produced no evidence of their disciplinary history and whether any of them were already on Step 3 when they violated defendant's safety rules.[12]

Plaintiff also asserts that defendant terminated his employment because he was two years

---

[11] This is just one of several ways that plaintiff may show pretext. See Simms v. Okla ex rel. Dep't of Mental Health & Substance Abuse, 165 F.3d 1321, 1328 (10th Cir.), cert. denied 528 U.S. 815 (1999).

[12] Although Hudson did not return to work, defendant offered to reinstate him. Also, to the extent defendant argues that defendant treated him differently than Salmon, Hudson and Brosnan because of his disability, the same reasoning applies.

from being eligible to retire with health benefits. Plaintiff's bare assertion, without more, does not raise a genuine issue of material fact that defendant terminated his employment because of age. See Reeder v. Wasatch Cnty. Sch. Dist., 359 Fed. Appx. 920, 924-25 (10th Cir. 2009) (although terminating employee to interfere with pension rights may violate ERISA, it is not, without more, an ADEA violation).[13]

Based on the record construed in the light most favorable to plaintiff, plaintiff has not cited evidence from which a reasonable jury might conclude that defendant's stated reason for terminating plaintiff's employment was a pretext for age discrimination. The Court therefore sustains defendant's motion for summary judgment as to plaintiff's ADEA claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #54) filed October 20, 2010 be and hereby is **SUSTAINED**.

Dated this 28th day of January, 2011, at Kansas City, Kansas.

                                           s/ Kathryn H. Vratil
                                           Kathryn H. Vratil
                                           United States District Judge

---

[13] Plaintiff has shown that he was roughly two years away from being able to retire with benefits, which would have included access to defendant's healthcare plan. Plaintiff has not, however, produced any evidence that he would qualify for retiree health insurance. Specifically, he has not shown that he timely made monthly health insurance contributions to defendant's healthcare plan. See Wise Decl., Tab 2 (Collective Bargaining Agreement, Article XXXI, Section 3). Nor did plaintiff produce evidence which linked his eligibility for retiree insurance to his age. See Reeder, 359 Fed. Appx. at 924-25 (termination shortly before retirement benefits vest may give rise to inference of age discrimination only if vesting is age-based as opposed to tenure-based).